IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| CONSUELO CERVANTES,<br>    Plaintiff, | § <br> § <br> § | |
| v. | § <br> § | EP-18-CV-111-PRM |
| EL PASO HEALTHCARE<br>SYSTEM LTD d/b/a DEL SOL<br>MEDICAL CENTER,<br>    Defendant. | § <br> § <br> § <br> § <br> § | |

## <u>MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

On this day, the Court considered Defendant El Paso Healthcare

System LTD d/b/a Del Sol Medical Center's [hereinafter "Defendant"]

"Motion for Summary Judgment" (ECF No. 21) [hereinafter "Motion"], filed

on March 14, 2019; Plaintiff Consuelo Cervantes's [hereinafter "Plaintiff"]

"Response to Defendant's Motion for Summary Judgment" (ECF No. 24),

filed on April 1, 2019; and Defendant's "Reply in Support of its Motion for

Summary Judgment" (ECF No. 26), filed on April 5, 2019, in the above-

captioned cause. After due consideration, the Court is of the opinion that the

Motion should be granted for the reasons that follow.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

This case centers around whether Plaintiff was properly screened and

stabilized in compliance with the Emergency Medical Treatment and Active

Labor Act after she presented at the Del Sol Medical Center (Del Sol) with abdominal pain. On April 9, 2016, at approximately 6:50 PM, Plaintiff sought emergency care for abdominal pain at the Del Sol emergency room. Mot. 1; Resp. 1. At approximately 6:51 PM, Plaintiff's vital signs were taken. Resp. Ex. A., at 5. Dr. Shariq Khan was assigned to examine Plaintiff. Mot. 2; Resp. Ex. A. Plaintiff previously had an abdominal surgery, specifically, an umbilical hernia[1] repaired with mesh. Resp. Ex. A, at 3, 9, 25. At approximately 7:12 PM, Dr. Khan completed a focused physical examination[2] and ordered laboratory tests, including a CT scan. Mot. Ex. A, at 30:2–37:19. The CT scan confirmed that Plaintiff had a recurrent ventral hernia containing bowel loops.[3] *Id.* at 39:11–14. No radiologist contacted Dr. Khan regarding an emergent finding based on the CT scan. *Id.* at 39:17–21.

---

[1] A "hernia" is defined as "the protusion of a loop or knuckle of an organ or tissue through an abnormal opening." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 859 (31st ed. 2007). An "umbilical hernia" is "a type of abdominal hernia in which part of the intestine protrudes at the umbilicus and is covered with skin and subcutaneous tissue." *Id.* at 862.

[2] Specifically, the focused physical examination was "[f]ocused to the history of present illness"—namely, Plaintiff's abdominal pain. Mot. Ex. A, at 30:8–17.

[3] "Recurrent" is defined, in relevant part, as "returning after remissions." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1632 (31st ed. 2007). "Ventral" means "pertaining to the abdomen." *Id.* at 2075. "Bowel" is "intestinum." *Id.* at 246.

Additionally, according to Plaintiff's medical records, Plaintiff was found to have a non-reducible hernia. Resp. Ex. C, at 1; Resp. Ex. A, at 5. Dr. Khan determined that the hernia was non-reducible when he palpated the hernia during his physical examination of Plaintiff. Mot. Ex. A, at 38:23–39:10. However, Dr. Khan did not formally attempt to reduce the hernia. *Id.*

According to the affidavit of William Allen Gibson, M.D., which Plaintiff attaches to Plaintiff's Response, "[a] non-reducible hernia containing loops of bowel indicates the bowel is trapped, incarcerated in medical jargon." Resp. Ex. C, at 2. Furthermore, if the incarcerated hernia causes ischemia[4] of the intestine, it is a "strangulated hernia" and is a "surgical emergency" because it could permanently injure the bowel. [5] *Id.* Dr. Gibson further testified that "[o]n April 9, 2016, [Plaintiff] was documented to have a non-reducible supra-umbilical hernia that was causing her severe abdominal pain." *Id.* In addition, the doctor testified that

---

[4] "Ischemia" is "deficiency of blood in a part, usually due to functional constriction or actual obstruction of a blood vessel." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 975 (31st ed. 2007).

[5] An "incarcerated hernia" is a "hernia of intestine that cannot be returned or reduced by manipulation; it may or may not become a strangulated hernia." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 861 (31st ed. 2007). A "strangulated hernia" is "an incarcerated hernia that is so tightly constricted as to compromise the blood supply of the contents of the hernial sac, leading to gangrene." *Id.* at 862.

"[s]evere abdominal pain is an emergency medical condition." *Id.*

Dr. Khan gave Plaintiff valium to relax her abdominal rectus muscle for any possible muscle spasm. Mot. Ex. A, at 39:22–41:3. In addition, Plaintiff was provided the narcotic hydromorphone and maintenance fluid. *Id.* at 41:4–42:19. At 9:43 PM, Dr. Khan reevaluated Plaintiff and found that her abdominal pain had improved. *Id.* at 43:14–24. In addition, Dr. Khan determined that there was no evidence of an incarcerated hernia. *Id.* at 45:5–11. Following his screening examination of Plaintiff and treatment of Plaintiff, Dr. Khan determined that Plaintiff did not have an emergency medical condition and diagnosed Plaintiff with a "recurrent hernia." *Id.* at 94:2–9, 94:18–20. At 9:46 PM, Plaintiff was discharged with prescriptions for pain and nausea medication. *Id.* at 51:16–24; Resp. Ex. A, at 10. Dr. Khan believed that, at the time that Plaintiff was discharged, her condition had stabilized and he expected no material deterioration of her condition. Mot. Ex. A, at 94:10–17.

However, after Plaintiff was discharged, Plaintiff was still in pain. Resp. Ex. D. Accordingly, Plaintiff returned to the Del Sol emergency room around 1:50 AM on April 10, 2016. *See id.*; Resp. Ex. B; Compl. 3. Dr. Khan again performed a medical screening examination on Plaintiff. Mot. Ex. A,

4

at 94:24–95:8. After the medical screening examination and speaking with the treating surgeon who was on call for the surgeon who had performed Plaintiff's prior hernia surgery, Dr. Khan determined that Plaintiff had an emergency medical condition. *Id.* at 95:6–96:23; Mot. 3 n.3.

Around 6:30 AM, Plaintiff was discharged from Del Sol. *Id.* at 97:21–23. Thereafter, she arrived at Providence East's emergency department at approximately 7:00 AM. Resp. Ex. D. Plaintiff alleges that, at that time, her vital signs indicated that she was in shock. Compl. 3. Plaintiff further alleges that, at Providence East, "Plaintiff was found to have a perforated bowel that caused her to develop sepsis."[6] *Id.* Additionally, she alleges that "[s]he underwent surgeries and had a long and complicated hospital stay." *Id.* Finally, "[s]he was discharged on May 15, 2016 and transferred to a nursing facility where she remained until mid-July, 2016." *Id.*

On April 2, 2018, Plaintiff filed her Complaint, bringing suit pursuant to 42 U.S.C. § 1395dd, the Emergency Medical Treatment and Active Labor Act ("EMTALA"). Plaintiff's claims in this case appear to be limited to her April 9, 2016, medical screening examination. *See* Compl. Though the

---

[6] "Perforated" means "pierced with holes." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1430 (31st ed. 2007). "Sepsis" is "the presence in the blood or other tissues of pathogenic microorganisms or their toxins." *Id.* at 1718.

factual allegations in her Complaint describe both Plaintiff's April 9th and April 10th visits to Del Sol Medical Center, and her cause of action does not specify the date of the alleged EMTALA violations, she only alleges that "Defendant's EMTALA violation of April 9, 2016 is a proximate cause of [Plaintiff's] injuries and damages." *Id.* at 3. Notably, she does not explicitly allege an April 10, 2016, EMTALA violation. *See id.* Furthermore, Defendant states in its Motion that Plaintiff "does not allege that the examination she was given on April 10 violated EMTALA. Rather, her complaint is limited to the screening examination performed on April 9." Mot. 3. n.3.[7] Plaintiff does not dispute Defendant's statement in her Response. Furthermore, in its Motion, Defendant only argues that the Court should enter summary judgment regarding Plaintiff's April 9, 2016, claims. Accordingly, in considering Defendant's Motion, the Court will only consider

---

[7] In addition, Defendant notes that Plaintiff has filed claims in connection with the April 10, 2016, screening as well as her treatment at Sierra Providence East in other courts. Mot. 3 n.3; *see* Notice of Related Cases, April 5, 2018, ECF No. 4; Joint Case Management Plan ¶ 10, Aug. 9, 2018, ECF No. 12. Specifically, Plaintiff has "brought a state court suit against Del Sol, alleging the screening examination she received on April 10 violated EMTALA. *See Cervantes v. El Paso Healthcare System Ltd.*, No. 2017DCV4175 in the County Court at Law Number Three of El Paso County, Texas." Mot. 3. n.3. Additionally, Plaintiff has "brought an EMTALA action against Tenet Hospitals, Ltd. for the treatment she received at Sierra Providence East. *See Cervantes v. Tenet Hospitals, Ltd.*, No. 3:18-cv-00110-KC in the Western District of Texas, El Paso Division." *Id.*

Plaintiff's claim related to Plaintiff's April 9, 2016, visit.

## II.  LEGAL STANDARD

### A.  Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(a), a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A genuine dispute exists "if the evidence is such that a reasonable [finder of fact] could return a verdict for the nonmoving party." *Rogers v. Bromac Title Servs., LLC*, 755 F.3d 347, 350 (5th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute 'is material if its resolution could affect the outcome of the action.'" *Exxon Mobil Corp. v. United States*, 108 F. Supp. 3d 486, 504 (S.D. Tex. 2015) (quoting *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005)).

"Under Federal Rule of Civil Procedure 56(c), the party moving for summary judgment bears the initial burden of . . . 'identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'" *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). When the moving party has met its initial burden, "the nonmovant must identify

specific evidence in the record and articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004). In adjudicating a motion for summary judgment, a court "consider[s] evidence in the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in favor of that party." *Bluebonnet Hotel Ventures, LLC v. Wells Fargo Bank, N.A.*, 754 F.3d 272, 276 (5th Cir. 2014). However, if the non-moving party fails to respond or otherwise "fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment if the motion and supporting materials— including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3).

## B.  The Emergency Medical Treatment and Active Labor Act

The Emergency Medical Treatment and Active Labor Act ("EMTALA") "was not intended to be used as a federal malpractice statute, but instead was enacted to prevent 'patient dumping', which is the practice of refusing to treat patients who are unable to pay." *Marshall on Behalf of Marshall v. E. Carroll Par. Hosp. Serv. Dist.*, 134 F.3d 319, 322 (5th Cir. 1998). Pursuant to EMTALA, if an individual comes to the emergency department of a hospital

and requests medical treatment, then "the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition . . . exists." 42 U.S.C. § 1395dd(a). If the hospital determines that the individual has an "emergency medical condition," then the hospital must either (A) provide, at the hospital, "further medical examination and such treatment as may be required to stabilize the medical condition," or (B) appropriately transfer the individual to another medical facility in accordance with EMTALA's requirements for transfer. *Id.* § 1395dd(b)(1).

## III.  ANALYSIS

Pursuant to EMTALA, Plaintiff brings a screening claim, alleging that Defendant failed to provide Plaintiff with an appropriate medical screening examination to determine if she had an emergency medical condition. *See* Compl.; Joint Case Management Plan ¶ 3.  In addition, Plaintiff brings a failure to stabilize claim, alleging that Defendant was aware of her emergency medical condition but failed to stabilize her prior to discharge. *See id.*

9

## A.  Failure to Provide Appropriate Medical Screening Claim

Plaintiff argues that Defendant failed to provide an appropriate medical screening examination, as required by EMTALA. What constitutes an "appropriate medical screening examination" is not defined by EMTALA. *Marshall*, 134 F.3d at 323. However, most courts have defined the phrase "as a screening examination that the hospital would have offered to any other patient in a similar condition with similar symptoms." *Id.* (collecting cases). The burden is on the plaintiff to demonstrate that the hospital failed to provide an appropriate medical examination pursuant to EMTALA. *Id.* at 323–24. The plaintiff may carry its burden by demonstrating one of the following:

> (1) the hospital failed to follow its own standard screening procedures; or (2) there were "differences between the screening examination that the patient received and examinations that other patients with similar symptoms received at the same hospital"; or (3) the hospital offered "such a cursory screening that it amounted to no screening at all."

*Fewins v. Granbury Hosp. Corp.*, 662 F. App'x 327, 331 (5th Cir. 2016) (quoting *Guzman v. Memorial Hermann Hosp. Sys.*, 409 F. App'x 769, 773 (5th Cir. 2011)). "[A]n EMTALA 'appropriate medical screening examination' is not judged by its proficiency in accurately diagnosing the

10

patient's illness, but rather by whether it was performed equitably in comparison to other patients with similar symptoms." *Marshall*, 134 F.3d at 322. "Negligence in the screening process or providing a faulty screening or making a misdiagnosis, as opposed to refusing to screen or providing disparate screening, does not violate EMTALA, although it may violate state malpractice law." *Guzman v. Mem'l Hermann Hosp. Sys.*, 637 F. Supp. 2d 464, 482 (S.D. Tex. 2009), *aff'd*, 409 F. App'x 769 (5th Cir. 2011). In short, "[t]he essence of [the screening] requirement is that there be some screening procedure, and that it be administered even-handedly." *Correa v. Hosp. San Francisco*, 69 F.3d 1184, 1192 (1st Cir. 1995).

Here, Defendant cites to evidence in the record demonstrating that Dr. Khan performed a medical screening examination on Plaintiff and that the medical screening examination was the same screening examination that other patients presenting with similar symptoms would have received. *See* Mot. 5. In particular, Dr. Khan testified that he performed a medical screening examination, which involved lab work, a CT scan, a physical exam, and obtaining vital signs, and that this medical screening examination performed on Plaintiff was similar to that any other patient would have received if they presented with similar symptoms. Mot. Ex. A, at 92:24–

11

93:21. Accordingly, Defendant has provided evidence establishing that Defendant, through Dr. Khan, performed a medical screening examination and that it was performed equitably. Therefore, Defendant has met its initial burden of identifying portions of the record that it believes demonstrate an absence of genuine issue of material fact.

As Defendant has met its initial burden, Plaintiff "must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim." *Johnson*, 379 F.3d at 301. Specifically, in order to avoid summary judgment on Plaintiff's screening claim, Plaintiff must "present evidence showing that there was a genuine issue of material fact whether [Defendant] had provided an EMTALA-appropriate medical examination." *Buras v. Highland Cmty. Hosp.*, 432 F. App'x 311, 313 (5th Cir. 2011) (citing *Marshall*, 134 F.3d at 323).

According to Plaintiff, Dr. Khan failed to ascertain several pieces of information when he performed the medical screening examination. Resp. 5–6. Specifically, Plaintiff cites to Dr. Khan's testimony that (1) he did not try to reduce Plaintiff's hernia because he did not know "what was going on" underneath it; (2) he did not know where the mesh was implanted from her prior surgery; (3) he did not know what surgery had been previously

performed on Plaintiff; (4) he did not know when a bowel obstruction would occur; (5) he did not know when vomiting would occur due to a bowel obstruction; (6) he did not discuss the CT with a radiologist; and (7) he did not consult with the surgeon on call. *Id.* (citing Resp. Ex. F). Furthermore, Plaintiff argues that Dr. Khan "admitted he did not have enough information or expertise regarding complications of an incarcerated hernia." *Id.* at 5.

In arguing that Dr. Khan should have made certain medical inquiries in order to determine whether Plaintiff had an emergency medical condition, Plaintiff appears to argue that Dr. Khan was negligent in his medical screening examination. However, "a treating physician's failure to appreciate the extent of the patient's injury or illness, as well as a subsequent failure to order an additional diagnostic procedure, may constitute negligence or malpractice, but cannot support an EMTALA claim for inappropriate screening." *Marshall*, 134 F.3d at 323. Accordingly, even if Plaintiff established that Dr. Khan was negligent in failing to provide certain additional screening during his medical screening examination, such negligence is inapposite to whether Defendant provided an appropriate medical screening pursuant to EMTALA.

Rather, Plaintiff may establish that the screening was inappropriate

pursuant to EMTALA by showing that Plaintiff's screening was disparate, in that the hospital failed to follow its own standard screening procedure or Plaintiff was treated differently than other patients with similar symptoms, or that the screening was so cursory that it amounted to no screening at all. *See Fewins*, 662 F. App'x at 331. Though Plaintiff does not appear to explicitly argue that any of these three theories apply, the Court will consider whether the facts in the record support the three theories.

### 1. Noncompliance with Standard Screening Procedures

First, the record does not suggest that the hospital failed to follow its standard screening procedure. To create a genuine issue of fact regarding whether a hospital failed to follow its standard screening procedure, a plaintiff must point to a specific procedure required by the hospital and argue that the specific procedure was not performed during the plaintiff's screening. *See King v. VHS San Antonio Partners*, LLC, No. SA-16-CV-1201-XR, 2018 WL 2147510, at *9 (W.D. Tex. May 9, 2018) (denying hospital's motion for summary judgment on EMTALA claim when the plaintiff alleged that the hospital did not follow its own standard screening procedure, which required a focused physical exam, and argued that the doctor did not perform a complete focused physical exam); *Stiles v. Tenet Hosps. Ltd.*, 494

14

F. App'x 432, 436 (5th Cir. 2012) (holding that summary judgment for hospital was proper and that whether the patient was physically examined by a physician was immaterial when the hospital's policy did not require such an examination).

Here, Plaintiff cites no facts in the record that suggest that the hospital had a specific protocol and that the hospital failed to follow that protocol in examining Plaintiff, thus disparately screening Plaintiff. Regarding the several actions which Plaintiff emphasizes that Dr. Khan failed to perform—such as consulting with the radiologist or obtaining additional information regarding Plaintiff's prior surgery—Plaintiff does not argue and cites no evidence in the record indicating that such actions are part of the standard screening procedure at Del Sol Medical Center.

Plaintiff cites Defendant's admission that at Del Sol Medical Center, "a medical screening examination is the process to reach, with reasonable clinical confidence, the point at which it can be determined whether or not the individual has an emergency condition or not." Resp. 5 (citing Resp. Ex. E). Plaintiff then argues that Dr. Khan's screening of Plaintiff failed to provide a basis to decide with reasonable clinical certainty whether or not Plaintiff had an emergency medical condition. *Id.* at 6. However,

Defendant's general requirement for a medical screening examination is not the type of specific "protocol" or "procedure" relevant to demonstrating disparate treatment in a specific case. The general policy does not fit within the common understanding of a "protocol" or "procedure" as set of detailed, specific steps.[8] Further, case law regarding the issue of a hospital's noncompliance with its own standard screening protocol tends to focus on whether the hospital completed a specific examination as part of screening. *See, e.g., King*, 2018 WL 2147510, at *9 (discussing whether doctor performed a complete focused physical exam). Accordingly, Plaintiff has not created a dispute of fact regarding whether Defendant failed to follow its standard screening procedure in administering its medical screening examination of Plaintiff.

Furthermore, Plaintiff points to the fact that Defendant did not have a specific protocol for the medical screening of a patient with abdominal pain. *See* Resp. 5; Resp. Ex. F, at 14:9–15:11. However, "EMTALA permits a hospital to have a general, as opposed to a symptom-specific, screening policy or procedure." *Guzman*, 637 F. Supp. 2d at 494. Accordingly, Defendant's

---

[8] In relevant part, a "protocol" is defined as a "detailed plan of a . . . medical . . . treatment, or procedure," and a "procedure" is defined as a "series of steps followed in a regular definite order." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 926, 936 (10th ed. 2001).

lack of a standard screening examination protocol for a patient with abdominal pain does not create an EMTALA violation.

In sum, Plaintiff's allegations and the summary judgment evidence, taken in the light most favorable to Plaintiff, do not support a theory that Plaintiff's medical screening examination failed to comply with Defendant's screening protocol.

### 2. Differences in Screening Between Plaintiff and Similar Patients

Furthermore, the undisputed facts in the record demonstrate that there were no "differences between the screening examination that the patient received and examinations that other patients with similar symptoms received at the same hospital." *Fewins*, 662 F. App'x at 331. Dr. Khan testified that the medical screening exam that Plaintiff received was the same or similar to the exams other patients would have received if they presented with the same or similar symptoms and history. Mot. Ex. A, at 93:16–21. Plaintiff does not argue that she was treated differently than other patients with the same or similar symptoms. Furthermore, she provides no evidence that other patients with similar symptoms received a different screening examination than Plaintiff did. Accordingly, there is no dispute of material fact regarding whether Plaintiff was treated differently

17

than similar patients.

### 3. Cursory Screening

A screening violates EMTALA if it is "'so cursory' that it is 'not designed to identify acute and severe symptoms that alert the physician of the need for immediate medical attention to prevent serious bodily injury.'" *Guzman*, 637 F. Supp. 2d at 483 (quoting *Bryant v. Adventist Health System/West*, 289 F.3d 1162, 1166 n.3 (9th Cir. 2002)). However, "an emergency room physician is only 'required by EMTALA to screen and treat the patient for those conditions the physician perceives the patient to have.'" *Id.* (quoting *Hunt v. Lincoln Cty. Memorial Hosp.*, 317 F.3d 891, 893 (8th Cir. 2003)).

Here, the undisputed facts in the record establish that Dr. Khan's medical screening was not so cursory "that it amounted to no screening at all, in that it was not designed to detect acute, severe symptoms." *Guzman*, 637 F. Supp. 2d at 481 (citing *Correa*, 69 F.3d at 1192–93). Dr. Khan examined Plaintiff in order to determine whether she had an emergency medical condition. Mot. Ex. A, at 92:20–93:05. Specifically, Dr. Khan completed a focused physical examination of Plaintiff and ordered laboratory tests, including a CT scan. *Id.* at 30:2–37:19. Dr. Khan reviewed his

18

imaging and laboratory findings and determined that there was no evidence of incarcerated tissue. *Id.* at 45:5–11. Based on his medical screening exam and after providing treatment to Plaintiff, Dr. Khan diagnosed Plaintiff with a recurrent hernia and determined that Plaintiff did not have an emergency medical condition. *Id.* at 94:2–23.

Plaintiff cites no case suggesting that such a screening is cursory or otherwise fails to satisfy EMTALA's requirement that a hospital perform an appropriate screening. Rather, Dr. Khan's screening of Plaintiff is in line with screening examinations which courts have held, based on summary judgment evidence, were not cursory as a matter of law. *See Guzman*, 637 F. Supp. 2d at 484 (holding that there was no EMTALA violation when the record demonstrated that two nurses and one doctor inquired about the plaintiff's symptoms, took a medical history, physically examined him, ordered a complete blood count test, reviewed all results, and provided treatment); *Fewins*, 662 F. App'x at 332 (affirming lower court's grant of summary judgment in favor of hospital and holding that examination was not cursory when the doctor ordered a CT and lab tests, reviewed results of the lab tests, and consulted with a radiologist). Therefore, based on the undisputed facts regarding Dr. Khan's examination of Plaintiff, the Court

determines that the medical screening examination was not so cursory that it amounted to no screening at all.

In sum, the undisputed facts in the record establish that Plaintiff was not screened disparately or subject to a screening that was so cursory that it amounted to no screening at all. Accordingly, the Court is of the opinion that summary judgment should be granted for Defendant on Plaintiff's screening claim.

## B.    Failure to Stabilize Claim

Pursuant to EMTALA, if a hospital determines that an individual has an emergency medical condition, the hospital must provide "such further medical examination and such treatment as may be required to stabilize the medical condition," or, appropriately transfer the individual to another medical facility in accordance with certain requirements. 42 U.S.C. § 1395dd(b). EMTALA defines an "emergency medical condition," in relevant part, as follows:

> a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in--
> > (i) placing the health of the individual . . . in serious jeopardy,
> > (ii) serious impairment to bodily functions, or
> > (iii) serious dysfunction of any bodily organ or part . . .

*Id.* § 1395dd(e)(1)(A). "[T]o stabilize" means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." 42 U.S.C. § 1395dd(e)(3)(A). "The duty to stabilize does not arise unless the hospital has actual knowledge that the patient has an unstabilized medical emergency." *Battle ex rel. Battle v. Mem'l Hosp. at Gulfport*, 228 F.3d 544, 558 (5th Cir. 2000) (citing *Marshall*, 134 F.3d at 325). "Whether a patient is in fact suffering from an emergency medical condition is 'irrelevant for purposes of [EMTALA].'" *Guzman*, 637 F. Supp. 2d at 505 (quoting *Harris v. Health & Hosp. Corp.*, 852 F. Supp. 701, 703 (S.D. Ind. 1994)). Rather, "[t]he statutory language makes clear that 'what matters is the hospital's determination of the patient's medical status. The standard is a subjective one.'" *Id.* (quoting *Harris*, 852 F. Supp. at 703). Accordingly, "[t]he duty to stabilize is determined in reference to the diagnosis, not in hindsight for what [the patient] 'turned out to have.'" *Id.* at 506 (quoting *Hoffman v. Tonnemacher*, 425 F. Supp. 2d 1120, 1142 (E.D. Cal. 2006)).

Here, Defendant cites to evidence in the record demonstrating that Dr.

Khan determined that Plaintiff was not suffering from an emergency medical condition at the time that Plaintiff was discharged. Mot. 3. Specifically, Dr. Khan testified that, at the time he discharged Plaintiff, he did not believe that she was suffering from an emergency medical condition. Mot. Ex. A, at 94:2–17. Accordingly, Defendant has met its initial burden of demonstrating that Defendant had no actual knowledge of Plaintiff's emergency medical condition and, therefore, had no duty to stabilize Plaintiff prior to discharge.

Therefore, Plaintiff must cite to evidence in the record and show how the evidence supports Plaintiff's claim. Specifically, to avoid summary judgment on her stabilization claim, Plaintiff must provide evidence suggesting that Defendant had actual knowledge that she was suffering from an emergency medical condition. Plaintiff cites to Dr. Khan's April 10th diagnosis of an emergency medical condition, attaches the affidavit of William Allen Gibson, M.D., and attaches Plaintiff's affidavit testifying about her pain at the time of her discharge. Plaintiff does not explicitly argue that such evidence demonstrates that Defendant had actual knowledge of Plaintiff's emergency medical condition. Nonetheless, the Court will consider whether the evidence creates a genuine dispute of fact as

22

to Defendant's knowledge of an emergency medical condition.

### 1. April 10th Diagnosis

Plaintiff argues that Dr. Khan "admits to violating EMTALA." Resp. 4. Specifically, Plaintiff asserts that Dr. Khan testified that "severe abdominal pain is an emergency medical condition." *Id.* at 2 (citing Resp. Ex. F at 106:18–107:11). Furthermore, Plaintiff argues, Dr. Khan "testified that [Plaintiff]'s severe abdominal pain was an emergency medical condition but, *twice* he discharged [Plaintiff] while she still had severe abdominal pain."[9] *Id.* In other words, Plaintiff argues, Dr. Khan "acknowledged that [Plaintiff] had an emergency medical condition but, instead of stabilizing her, he *twice* violated EMTALA by discharging, or dumping, her." *Id.*

In support of Plaintiff's claim that Dr. Khan testified that Plaintiff's severe abdominal pain was an emergency medical condition, Plaintiff cites Dr. Khan's testimony regarding Plaintiff's April 10th visit. Resp. 2 (citing Resp. Ex. F, at 106:18–107:11). In his deposition, Dr. Khan testified that,

---

[9] Here, in Plaintiff's Response, Plaintiff appears to contend that Defendant violated EMTALA during Plaintiff's April 10th visit. However, as explained in Part I of this Order, Defendant only moves for summary judgment regarding Plaintiff's April 9th EMTALA claims. Accordingly, the Court will only make a determination regarding Plaintiff's claims related to her April 9th visit to Del Sol Medical Center. The Court will, however, consider Plaintiff's April 10th visit to the extent that it is relevant to Defendant's knowledge of an emergency medical condition on April 9th.

during Plaintiff's April 10th visit, he determined that the severity of Plaintiff's abdominal pain was an emergency medical condition. Resp. Ex. F, at 106:18–107:11. Contrary to Plaintiff's assertion, Dr. Khan did not testify that abdominal pain is generally an emergency medical condition. *See id.* Furthermore, he did not testify that he determined that Plaintiff had an emergency medical condition during her April 9th visit. *See id.*

Indeed, Plaintiff cites no evidence in the record showing that Dr. Khan determined or that Defendant otherwise had knowledge that Plaintiff had an emergency medical condition during her April 9th visit. Rather, Dr. Khan testified that, on April 9th, following his screening examination of Plaintiff and treatment of Plaintiff, he determined that Plaintiff did not have an emergency medical condition. Mot. Ex. A, at 94:2–9. Dr. Khan diagnosed Plaintiff with a "recurrent hernia" and ruled out the existence of an incarcerated umbilical hernia. *Id.* at 52:8–16; 94:18–20. Dr. Khan further testified that, at the time that Plaintiff was discharged on April 9th, he believed that her condition had stabilized and he expected no material deterioration of her condition. *Id.* at 94:10–17.

Furthermore, the fact that Dr. Khan determined that Plaintiff had an emergency medical condition during her April 10th visit does not create a

24

fact issue regarding Defendant's knowledge of an emergency medical condition on April 9th. During Dr. Khan's April 10th examination of Plaintiff, he was able to take into account the prior laboratory findings and CT scan from Plaintiff's prior visit, perform another physical examination, speak with the treating surgeon who was on call for the surgeon who had performed Plaintiff's prior hernia surgery, and, presumably, consider the subsistence of Plaintiff's pain hours after her first discharge. *See id.* at 95:6–96:23. Accordingly, especially because the medical screening examinations were not identical, the fact that the April 10th medical screening examination led to diagnosis of an emergency medical condition does not suggest that the hospital was aware of such emergency medical condition during the medical screening examination several hours earlier. In other words, it is not reasonable to infer that because Dr. Khan concluded that Plaintiff had an emergency medical condition on April 10th, he had actual knowledge of Plaintiff's emergency medical condition on April 9th. Therefore, Dr. Khan's determination of an emergency medical condition on April 10th does not create a genuine issue of material fact as to whether Defendant knew Plaintiff had an emergency medical condition on April 9th.

## 2.    Affidavit of William Allen Gibson

Though Plaintiff does not discuss it in her Response, Plaintiff attaches

the Affidavit of William Allen Gibson, M.D., as an exhibit to her Response.

Resp. Ex. C.  The Court is of the opinion that Dr. Gibson's affidavit does not

create a fact issue as to whether Defendant had actual knowledge of

Plaintiff's emergency medical condition on April 9th.  "EMTALA requires

actual knowledge of an emergency medical condition; knowledge of

symptoms that could indicate the potential for such a condition is

insufficient to trigger the duty to stabilize." *Guzman*, 637 F. Supp. 2d at

507.  Expert testimony that a specific condition diagnosed by a hospital is, in

fact, an emergency medical condition can create a fact issue as to whether

the hospital had actual knowledge of an emergency medical condition.  For

example, in *Battle*, the Fifth Circuit held that the lower court erred in

granting judgment as a matter of law on the plaintiff's stabilization claim.

*Battle*, 228 F.3d at 559.  Specifically, the Fifth Circuit held that there was

evidence from which a jury could conclude that the hospital had released the

patient "even though the doctors knew he was suffering from seizures that

had not been stabilized and were of an unknown etiology." *Id.*  In particular,

the plaintiffs cited to the doctor's written diagnosis of "seizure disorder" on

the emergency room chart and presented expert testimony that "seizure disorder" is an emergency medical condition because deterioration is likely to occur. *Id.*

Here, Dr. Gibson's affidavit does not create a fact issue because he testified regarding certain results from Plaintiff's medical examination, not the actual diagnosis that Plaintiff received. Specifically, Dr. Gibson testified that certain results from Plaintiff's medical screening examination indicate an incarcerated hernia, which can develop into a strangulated hernia, a "surgical emergency." Resp. Ex. C, at 1–2. Furthermore, Dr. Gibson testified that "[s]evere abdominal pain is an emergency medical condition." *Id.* at 2. However, Dr. Gibson's affidavit is silent on Dr. Khan's actual diagnosis. In particular, Dr. Khan diagnosed Plaintiff with a "recurrent hernia" and ruled out the existence of an incarcerated umbilical hernia. *Id.* at 52:8–16; 94:18–20. Therefore, the affidavit in this case is distinguishable from the expert testimony in *Battle* because Dr. Gibson's affidavit does not opine on whether the condition that Dr. Khan diagnosed is an emergency medical condition. That Defendant might have had knowledge of certain results or symptoms indicating the possibility of an emergency medical condition does not alone trigger the duty to stabilize; a duty to stabilize is only triggered if there is

actual knowledge of an emergency medical condition. Accordingly, Dr. Gibson's affidavit does not create a genuine dispute as to whether Dr. Khan or the hospital had actual knowledge of an emergency medical condition.

### 3.    Plaintiff's Pain

Lastly, the Court considers whether the existence of Plaintiff's pain at the time of discharge creates a fact issue as to whether Defendant had knowledge of an emergency medical condition. In her affidavit, Plaintiff testifies that, when she was discharged on April 9th, "[her] pain was such that [she] was not able to pay attention to the instructions." Resp. Ex. D. However, "[p]ain alone cannot impute actual knowledge of an emergency medical situation to the hospital." *Stiles*, 494 F. App'x at 437 (citing 42 U.S.C. § 1395dd(e)(1)). Furthermore, Plaintiff does not allege that Defendant was aware of the severity of Plaintiff's pain at the time of discharge, much less an emergency medical condition underlying it. Indeed, Dr. Khan testified that, upon reevaluation of Plaintiff, he found that her abdominal pain had improved. *Id.* at 43:14–24. Therefore, the evidence of Plaintiff's pain at the time of discharge does not create a fact issue regarding Defendant's knowledge of any emergency medical condition.

In sum, Defendant has put forth evidence establishing that Defendant had no actual knowledge of Plaintiff's emergency medical condition on April 9th, and Plaintiff has failed to cite to evidence in the record creating a genuine dispute as to Defendant's lack of actual knowledge. Therefore, because Defendant lacked actual knowledge of an emergency medical condition, no duty to stabilize was triggered pursuant to EMTALA. Accordingly, Defendant is entitled to summary judgment regarding Plaintiff's stabilization claim.

## IV. CONCLUSION

In sum, Plaintiff has not cited to evidence in the record suggesting that her screening (1) failed to comply with Defendant's standard screening procedure, (2) was different than the screenings that patients with similar symptoms receive, or (3) was so cursory that it amounted to no screening at all. Therefore, Defendant is entitled to summary judgment on Plaintiff's screening claim. Furthermore, the undisputed facts in the record demonstrate that Defendant had no actual knowledge of any emergency medical condition that Plaintiff had on April 9th. Consequently, Defendant had no duty to stabilize Plaintiff prior to her discharge on April 9th, and Defendant is entitled to summary judgment on Plaintiff's stabilization claim.

Thus, the Court is of the opinion that summary judgment should be granted for Defendant as to Plaintiff's April 9th EMTALA claims.

Accordingly, **IT IS ORDERED** that Defendant El Paso Healthcare System LTD d/b/a Del Sol Medical Center's "Motion for Summary Judgment" (ECF No. 21) is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant El Paso Healthcare System LTD d/b/a Del Sol Medical Center and Plaintiff Consuelo Cervantes **JOINTLY FILE**, within **seven (7) days** of entry of this Order, a report which states the parties' positions on whether Plaintiff's Complaint claims that Defendant violated EMTALA on April 10, 2016.

SIGNED this _25_ day of **April, 2019**.

PHILIP R. MARTINEZ
UNITED STATES DISTRICT JUDGE